UNITED STATES of America, Plaintiff–Appellee,

v.

Tommy BRISCOE, Defendant–Appellant.

No. 94–1414.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1995.

Decided Sept. 5, 1995.

Barry Rand Elden, Asst. U.S. Atty., John Podliska (argued), Office of the United States Attorney, Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Clarence L. Burch, Burch & Delgado, Chicago, IL, Julius L. Echeles (argued), Chicago, IL, for defendant-appellant.

Before EASTERBROOK, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Tommy Briscoe, the former president of the Chicago Local of the American Postal Workers Union, AFL–CIO, was charged and convicted of two counts of mail fraud, six counts of wire fraud, theft and embezzlement of union funds, causing the issuance of an illegal union loan, destruction of financial records required to be kept by a labor union, income tax evasion, failure to file a federal income tax return, and filing a false federal income tax return. Mr. Briscoe was sentenced to forty-six months of incarceration and three years of supervised release on four of the counts and a concurrent twelve months of incarceration and one year of supervised release on the ten other counts. Mr. Briscoe was also ordered to make $50,000 restitution to the Chicago Local Union, and to pay a special assessment of $625. Mr. Briscoe appeals. We affirm the judgment of the district court.

# I
# BACKGROUND

A. *Facts*

In August 1982, Tommy Briscoe, president of the 3,000 member Chicago Local of the American Postal Workers Union (hereinafter "Union" or "APWU") met with Abram Shy Glass, president of Sir Finance Corporation, to discuss a proposal to operate a loan program for postal employees. Under the proposal, Chicago APWU members would be eligible for loans and would repay Sir Finance through direct payroll deductions. After a series of negotiations, Briscoe and Glass

agreed that Sir Finance would be allowed to use union office space and union administrative personnel to operate the loan program and that Sir Finance would pay fifty cents to Briscoe for every loan repayment made by each borrower. Mr. Briscoe was also given the sole authority to approve the loan applications.

Pursuant to this agreement, Glass made fifty-nine payments, totaling $120,000, to Mr. Briscoe or third parties (at Briscoe's direction) between December 1982 and June 1987. Many checks given to Mr. Briscoe were made payable to an inactive business that possessed a dormant checking account on which Mr. Briscoe was a signatory.

All of the loan payments made by the employees, including a $15 application fee, were collected by payroll deduction. The deductions were made by the Postal Service at the Postal Data Center in Minneapolis, Minnesota. Those deductions, from 1984 until 1988, were sent by mail or wire transfer to Sir Finance's bank in Evanston, Illinois. The effective annual percentage rate of the loans was sixty-seven and one-half percent. The applications were processed exclusively by union administrative personnel who estimated that they spent, at minimum, ninety percent of their time processing loan applications. Mr. Briscoe was the only party who supervised the union personnel.

From the inception of the Sir Finance loan program, postal employees who were not members of the Union were permitted to procure loans through the program. Every employee seeking a loan, whether union member or not, would be responsible for the $15 service fee on each loan. In November 1984, this practice was stopped after an investigator for the Illinois Department of Finance questioned Mr. Glass about the fee.[1] However, by April 1985, Mr. Briscoe instituted a program, by issuing, on Chicago APWU letterhead, a signed notice that required each loan applicant who was not a member of the Union to "become an associate member of Chicago–APWU." The notice also stated that the "associate membership yearly fee

[was] $12 payable prior to loan pick up." Gov.Ex. 119; see Tr. II at 242–47.

The administrative staff was instructed by Briscoe to tell loan applicants who complained about the $12 fee that nonmembers of the Chicago APWU had to become associate members of the Union to qualify for a loan. At Briscoe's direction, the union personnel were to collect the associate member fees in cash only. Loan applicants who paid the fee were given a receipt by the union staff. A duplicate receipt was retained in an associate membership fee book. These collected fees and the receipt book were then turned over to Briscoe personally at the end of the day. If Briscoe was absent from the office, the cash was placed in a drawer in Briscoe's office desk.

Between 1984 and 1987, the union staff collected 7,044 associate membership fees totalling $84,528. These fees, given to Mr. Briscoe, were neither recorded in the Union's books, nor deposited in any of its bank accounts. James Thomas, a bookkeeper for the Union from February 1986 until August 1987, testified that he had observed Mr. Briscoe destroying associate membership fee records by tearing them up and placing them in a trash receptacle.

The trial record also contains evidence that Mr. Briscoe was responsible for taking other money earmarked for the Union. In 1986 and 1987, the Union sponsored a bowling tournament for its members. Cash entries of over $12,000 were collected for those years and delivered to Mr. Briscoe, but that cash was never recorded on union books or deposited in union bank accounts. Additionally, Mr. Briscoe arranged for the Union to pay out cash to himself and a personal friend, Doris Mayes. First, he entered into an agreement, as president of the APWU, with Mayes in which Mayes loaned the Union $15,000 and the Union in return paid Mayes ten percent interest per month ($1500). Ultimately, the Union paid Mayes $43,000, $28,000 of which represented interest. Second, Briscoe arranged for over $5,000 to be paid to the FDIC from union accounts in satisfac-

---

1. Mr. Glass testified that Sir Finance, under the terms of its state license, was not permitted to charge a fee for loans and that imposing such a charge would jeopardize its license. Tr. II at 250–51.

tion of a personal obligation Briscoe owed to a bank now managed by the FDIC. Finally, in 1987, Briscoe arranged for the Chicago APWU to pay $13,593 of overdue taxes he personally owed to the Internal Revenue Service. Briscoe wrote and signed a letter requesting a $20,000 salary advance. Two union purchase vouchers, signed by Briscoe, authorized the disbursement of $13,593 to the IRS and $6,407 to Briscoe. The check to the IRS was recorded in the general ledger of the Union as penalties and interest expense, IRS; the Briscoe check, however, was recorded as an advance to Briscoe.

Mr. Briscoe's personal tax problems with the IRS were not resolved fully by the issuance of the union check. For the tax years 1980–82 and 1985 he filed late returns and in 1983, 1984 and 1987, he failed to file a return. For all of the deficient tax years, Mr. Briscoe owed taxes in addition to what had been withheld from his salary. In 1986, the only year in which Briscoe filed a timely tax return, he submitted the $13,593 check from the Union to cover his tax liabilities. Given the payments that Mr. Briscoe had the Union disburse, and the payments that Mr. Briscoe kept, there was income totalling approximately $98,000 that went unreported.

## B. *Prior Proceedings*

On April 12, 1991, Mr. Briscoe was charged in a two count indictment for tax evasion and failure to file an individual federal income tax return in violation of 26 U.S.C. §§ 7201 and 7203. Eventually, a third superseding indictment was returned in October 1992. This indictment charged Mr. Briscoe with seventeen counts of illegal activity. Counts one and two alleged mail fraud in violation of 18 U.S.C. § 1341;[2] counts three through eight alleged wire fraud in violation

of 18 U.S.C. § 1343;[3] count nine claimed theft and embezzlement of union funds in violation of 29 U.S.C. § 501(c); count ten alleged causing the issuance of an illegal union loan in violation of 29 U.S.C. § 503; count eleven claimed destruction of financial records required to be kept by a labor union in violation of 29 U.S.C. § 439(c); counts twelve and sixteen alleged income tax evasion for years 1984 and 1987 under 26 U.S.C. § 7201; counts thirteen and seventeen alleged failure to file federal income tax returns for years 1984 and 1987 under 26 U.S.C. § 7203; and counts fourteen and fifteen claimed the filing of false income tax returns for years 1984 and 1986, in violation of 26 U.S.C. § 7206(1).

Mr. Briscoe's case was tried before a jury from April 14, 1993 until May 24, 1993. After five days of deliberation, the jury returned a verdict of guilty on counts one through thirteen, and count fifteen, and not guilty on counts fourteen, sixteen and seventeen. In January 1994, Mr. Briscoe was sentenced to forty-six months of incarceration and three years of supervised release on counts six through nine and a concurrent term of twelve months of incarceration and one year of supervised release for counts one through five, ten through thirteen and fifteen. Mr. Briscoe was also ordered to pay restitution to the Union in the amount of $50,000 and to pay a special assessment of $625.

## II
## ANALYSIS

Mr. Briscoe raises a number of issues on appeal. First, he contends that, under the holding of *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292

---

2. 18 U.S.C. § 1341 provides in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than five years, or both.

3. 18 U.S.C. § 1343 states in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

(1987), the indictment and evidence fail to allege a mail and wire fraud scheme to defraud the Union of its property. Additionally, Mr. Briscoe submits that the evidence of record was insufficient to support his convictions: (1) for embezzlement of the associate membership fees (count nine) and destruction of records relating to the fees (count eleven); (2) for making an illegal loan (count ten); and (3) for tax evasion in 1984, willful failure to file a tax return for 1984 (counts twelve and thirteen), and filing a false tax return for 1986 (count fifteen). Finally, Mr. Briscoe submits that the district court incorrectly calculated his sentence under the U.S. Sentencing Guidelines because the court: (1) improperly computed the amount of the Union's monetary loss; (2) double counted when it enhanced Mr. Briscoe's sentence both for his leadership role and for more than minimal planning; and (3) enhanced Mr. Briscoe's sentence for obstruction of justice based on the destruction of Union records even though another count in the indictment referred to such destruction. We review each contention in turn.

## A. *McNally Issues*

### 1. *Sufficiency of the Indictment*

■ We review de novo any challenge to the sufficiency of an indictment in light of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *See Frank v. United States*, 914 F.2d 828, 829 (7th Cir.1990). Mr. Briscoe submits that the indictment, at best, alleges a "scheme to defraud the union and its members of intangible rights, or to obtain property from persons other than the union and its members." Appellant's Br. at 11. Because the illegal activity charged in the indictment occurred prior to the amendment of the mail and wire fraud statutes to include the deprivation of intangible rights, Mr. Briscoe alleges that his conviction in regard to the wire and mail fraud counts (counts one through eight) should be reversed.

In *McNally*, 483 U.S. at 360–61, 107 S.Ct. at 2881–82, the Supreme Court held, in considering a self-dealing patronage scheme involving Kentucky state officials, that the mail fraud statute, as then written, criminalized schemes to defraud, as well as schemes "for obtaining money or property by means of false or fraudulent pretenses, representation, or promises," *id.* at 358, 107 S.Ct. at 2880, but not schemes to defraud citizens of "the intangible right ... to good government." *Id.* at 356, 107 S.Ct. at 2879. The Court reversed the convictions of the two defendants, holding that their conduct was not within the ambit of 18 U.S.C. § 1341. Subsequently, in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court clarified the coverage of the mail and wire fraud statutes in the *McNally* context. In *Carpenter*, a unanimous Court upheld the conviction of a *Wall Street Journal* reporter who had disclosed financial information, gathered in the course of business, to investors who traded on that information before its publication. The Court stated that the mail and wire fraud statutes' coverage extends to both tangible and *intangible* property rights, and recognized that confidential business information is intangible property that is protected by the fraud statutes. 484 U.S. at 25–26, 108 S.Ct. at 320. The Court further stated that a scheme to defraud does not require any showing of actual monetary loss or injury, but can rest on a showing that the victim was deprived of the right to exclusive use of the information. *Id.* at 26, 108 S.Ct. at 320. *McNally* and its progeny have been applied extensively by this court.[4] "[T]he common thread running through 'intangible rights' cases is that they involve rights whose violation would ordinarily result in no concrete economic harm; that is not the case here." *United States v. Bailey*, 859 F.2d 1265, 1276 (7th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989).

■ Mr. Briscoe submits that the indictment failed to charge a mail and wire fraud

4. *See, e.g., Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247 (7th Cir.1995); *United States v. Walters*, 997 F.2d 1219 (7th Cir.1993); *United States v. Barber*, 881 F.2d 345 (7th Cir.1989), *cert. denied*, 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990); *Ranke v. United States*, 873 F.2d 1033 (7th Cir.1989); *United States v. Cosentino*, 869 F.2d 301 (7th Cir.), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989).

that deprived the Union and its members of money and property. After review of the indictment, however, we are confident that the indictment charges that Mr. Briscoe intentionally devised a scheme furthered through the mail and telephone lines to defraud and to obtain money and property from the Union and its members. The indictment alleged that Sir Finance operated a loan program for postal employees at the Union office, R.47 at 3; Mr. Briscoe authorized Sir Finance to use the union "office space and secretarial services ... without paying any compensation." *id.;* Briscoe created "associate membership" fees and instructed the secretaries to collect a $12 annual cash payment from non-union members who applied for a loan, *id.* at 4; these fees were collected by the secretaries and turned over to Mr. Briscoe at the end of each day, *id.* at 5. Mr. Briscoe also received "kickbacks" from Glass, president of Sir Finance, based on the number of loan repayments. *Id.* Thus, the indictment alleged sufficiently that Briscoe fraudulently obtained money and property from the Chicago APWU and its members, totalling over $84,000 in "associate membership" fees and $120,000 in kickbacks paid by Sir Finance for the use of the union resources to administer its loan program.

### 2. *Evidence*

Mr. Briscoe also contends that the evidence shows that the Union suffered a loss only of intangible rights. He submits that he received no money from the Union; the funds in question came only from non-members of the Union and from Sir Finance.

■ To prove mail fraud under section 1341, the government must show: (1) a scheme to defraud; (2) committed with intent to defraud; and (3) use of the mails to further the fraudulent scheme. 18 U.S.C. § 1341.[5] The elements of wire fraud under 18 U.S.C. § 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir.1990) (per curiam). The government is not required to prove that the scheme to defraud was successful; it need only prove that a scheme existed in which use of the mails was reasonably foreseeable and that an actual mailing occurred in furtherance of the scheme. *United States v. Dick*, 744 F.2d 546, 550 (7th Cir.1984).

The government established at trial that Mr. Briscoe not only received money as a result of his creation of an "associate membership" fee, but also as a result of the "kickbacks" that Sir Finance gave him in return for the use of union resources to administer the loan program. Mr. Briscoe submits that, because the "associate member" fees were paid by nonmembers of the Union, the Union was not deprived of property, and therefore the mail fraud statute was not violated.

■ We believe that the district court properly characterized Mr. Briscoe's pocketing of the $84,000 in "associate membership" fees as a direct deprivation of the Union's funds.[6] As the district court noted, the non-

---

**5.** *See Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954) (describing required elements of proof); *United States v. Cosentino*, 869 F.2d 301, 307–08 (7th Cir.) (same), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989).

**6.** We also believe that Mr. Briscoe cannot rely upon this court's rejection of a "constructive trust theory" in *United States v. Holzer*, 840 F.2d 1343, 1348 (7th Cir.), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988), to escape liability for the "associate member" fees. Unlike Briscoe, Holzer was "not accused of having diverted to his own pocket money intended for his employer; the State of Illinois does not sell justice." *Id.* at 1348.

Nor do we believe that Mr. Briscoe can find comfort in our decision in *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir.1993). Mr. Briscoe established a scheme to defraud in order to "obtain" money or property earmarked for the Union. In *Walters*, the defendant, a sports agent who threatened extortion to enforce some of his contracts with collegiate athletes, incidentally caused losses to universities by depriving them of an intangible right: the benefits of "amateurism" in collegiate sports. By inducing the collegiate athletes to sign an agreement making Walters their representative in negotiations with professional teams, he destroyed the athletes' NCAA eligibility because under NCAA guidelines such contracts make an individual a "professional." Mr. Walters "planned to profit [from his scheme] by taking a percentage of the players' [eventual]

member applicants paid this money to the Union, not to Mr. Briscoe. There was sufficient evidence to permit the jury to determine that the local Union could engage in such financial transactions.[7] More to the point, the applicants paid the money to the Union in order to participate on equal footing with union members in the union-sponsored loan program. There is no contention that the Union did not have the authority to recoup the expenses that accompanied this extension of their services to nonmembers. In any event, Mr. Briscoe's retention of this money for his own benefit clearly constitutes a deliberate deprivation of a financial opportunity that violates the mail and wire fraud statutes. Our cases have recognized that such a deprivation is clearly pecuniary in nature and forbidden even under the unamended mail fraud statute.[8]

In *United States v. Ashman*, 979 F.2d 469, 477 (7th Cir.1992), we held that a "matching trade" scheme in which brokers traded buy and sell orders in equal quantity with cooperating local brokers by agreeing on the price of the trade, rather than bidding or offering the customer orders on the open market and securing the best price available, constituted a deprivation of "money and property" under the terms of the mail and wire fraud statutes, and thus did not implicate the "intangible rights" limitations set forth in *McNally*. We explained that the traders, by determining customer prices themselves, removed their customers' bids from the marketplace and forced customers to accept inferior results, thus guaranteeing profits to the broker and denying the customers the opportunity to obtain better prices. The "shifting ... of economic risk or opportunity to affect a person's financial position adversely deprives that person of money or property." *Id.* at 478.

The acceptance of kickbacks by Mr. Briscoe also deprived the Union of the opportunity to negotiate a more favorable economic position with Sir Finance. *See Ranke v. United States*, 873 F.2d 1033, 1037–40 (7th Cir.1989). The Union had a right to know the entirety of the terms by which it was doing business with Sir Finance and, on the basis of that complete disclosure, to negotiate the most favorable loan program possible for its membership. Mr. Briscoe's duplicity deprived the Union of that financial opportunity.

### 3. *Jury Instructions*

▆ Mr. Briscoe also submits that the jury instructions were confusing, and allowed the jury to find guilt without specifically finding a loss of money or property of the Union. Mr. Briscoe contends that the instructions allowed the jury to convict him on an "intangible rights" theory.[9] Our review of

---

professional incomes, not of their [current] scholarships." *Id.* Thus, the government in *Walters* could not sustain its *McNally* burden because it could not allege sufficiently that the victims lost money that was meant for them. Mr. Briscoe, unlike Mr. Walters, planned and did obtain money meant for the Union.

7. We note that the national secretary-treasurer of the Union testified that the national union has an associate member plan in order to facilitate participation in the union's health care plan by other federal employees. The local unions have total autonomy as long as they act in conformity with the national constitution. He was aware of no prohibition against the local Union's establishing an associate membership or engaging in otherwise lawful fundraising. He further testified that, if a local had an associate membership program, the funds collected pursuant to such a program would belong to the Union.

8. *See Lombardo v. United States*, 865 F.2d 155, 159 (7th Cir.) (holding in case in which defendants claimed that the victims were defrauded only out of intangible rights, that the attempted sale of a piece of property at a price lower than existing higher bids constituted a scheme to obtain money or property by fraudulent means), *cert. denied*, 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989); *United States v. Dial*, 757 F.2d 163, 168–70 (7th Cir.) (holding that a futures broker committed fraud by causing customers to lose additional profits because broker personally traded ahead of the customers), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985); *see also LeFevour v. United States*, 748 F.Supp. 579, 584 (N.D.Ill.1990) (holding that bribe money that judge received to settle traffic tickets was money that should have gone to city and therefore constituted a deprivation of city property for purposes of the mail fraud statute).

9. In reviewing these jury instructions, we must keep in mind the holding of the Supreme Court in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). In *Griffin*, a jury returned a general verdict finding a defendant guilty of conspiracy to defraud the United States

the instructions given to the jury convinces us that the jury was correctly instructed.

The jury was correctly instructed on the law of mail and wire fraud. The record makes clear that the jury was not instructed, nor was the case tried, on an "intangible rights" approach. Additionally, the court provided the jury with an instruction offered by Briscoe clarifying that a breach of fiduciary duty was not, after *McNally*, proof of mail or wire fraud.

First, the court explained the burden of proof of the government for both the mail and wire fraud counts. Then the court defined each component part of the mail and wire fraud offenses. The court stated that:

A scheme to defraud under the mail fraud and wire fraud statutes means some plan or course of action intended to deceive another and to deprive another of money or property of value by means of false pretenses, representations or promises.

R. 172–20 at 3921. The court next defined "intent to defraud." It stated:

Although it is not necessary that the government prove all the false pretenses, representations, promises and acts charged in the portion of the indictment describing the scheme, it is essential that one or more of them be proven beyond a reasonable

doubt, establishing the existence of the scheme to defraud.

The phrase "intent to defraud" means that the acts charged were done knowingly, with the intent to deprive the American Postal Workers Union or its members in order to cause loss to the American Postal Workers Union or its members or financial gain to the defendant.

R. 172–20 at 3922. Finally, the court ended its instructions with Mr. Briscoe's suggested statement in combination with a final sentence to which Mr. Briscoe objected:

To prove mail or wire fraud it is not enough that the defendant violated a fiduciary duty to the Chicago APWU. The mail fraud and wire fraud statutes can be violated whether or not there is any loss or damage to the victim of the crime.

*Id.*

We cannot conclude that the jury instructions were in any way prejudicial.[10] Indeed, they set forth in clear and concise terms the applicable legal standards. The instructions also commented specifically on the property or money limitation of *McNally*, explicitly rejecting the proposition that a breach of a fiduciary duty is enough to convict under the mail and wire fraud statutes.[11]

by impairing the investigations of the IRS to ascertain income taxes and impairing the inquiries of the Drug Enforcement Administration to ascertain forfeitable assets. The Court determined that there was sufficient evidence to prove that the defendant conspired to defraud the IRS, but that the evidence was insufficient, as the government so conceded, to demonstrate that the defendant conspired to defraud the DEA. It held that the government's failure to prove one of the unlawful objectives of the conspiracy did not require the reversal of the defendant's conviction. *Id.* at 55–58, 112 S.Ct. at 472. Therefore, although a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is legally infirm, a verdict need not be overturned in a situation in which one of the possible bases of conviction was factually insufficient. Thus, after *Griffin*, we are instructed that, in the context of a crime like fraud, in which the government must charge and prove a deprivation of money or property, a verdict must be reversed if the jury could have based its verdict on the legally infirm objective of "intangible rights." *See United States v. Self*, 2 F.3d 1071, 1093 (10th Cir.1993). However, if one of several

factual grounds that would support the verdict is factually insufficient, we are not required to reverse the verdict. Rather, we are allowed to presume that the jury rejected the factually inadequate theory and convicted on a ground for which the evidence was sufficient. *See id.*

10. During jury deliberations, a question was presented to the court in regard to Counts 1–8:

Two, in order to prove that there was a loss to the union, does it have to be a direct loss, e.g., taking money from the union; or, can it be an indirect loss, e.g. money which was supposed to go to the union and didn't? The second question stems from the definition of—afforded to the phrase "intent to defraud" found in the instructions at approximately page 36.

Tr. 172–26 at 4077–78.

After considering the advice and concerns of the government and Mr. Briscoe's counsel, the court responded, "Question number two, it can be either the direct or indirect loss as you describe in your question." Tr. 172–26 at 4090.

11. In *Lombardo v. United States*, 865 F.2d at 159, we stated that, even though the indictment and jury instructions may contain language support-

586

## B. *Sufficiency of Evidence*

■ At the outset of our analysis, we emphasize our standard of review. A defendant who challenges a conviction on the basis of the sufficiency of the evidence bears a heavy burden. *United States v. Hubbard,* 22 F.3d 1410, 1414 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 762, 130 L.Ed.2d 660 (1995). We appraise "the evidence and accompanying inferences in the light most favorable to the government. We shall not disturb the jury's finding unless the record is devoid of any evidence from which a jury could find guilt beyond a reasonable doubt." *United States v. Sandoval–Curiel,* 50 F.3d 1389, 1392 (7th Cir.1995) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)); *see also United States v. Anderson,* 61 F.3d 1290, 1294–95 (7th Cir.1995).

### 1.

■ Mr. Briscoe first contends that the evidence is not sufficient to sustain a conviction for embezzlement of the associate membership fees (count 9), 29 U.S.C. § 501(c), and for destruction of the records relating to the associate membership fees (count 11), 29 U.S.C. § 439(c). Mr. Briscoe submits that the $84,000 in associate membership fees was not union property, and that the receipts for those fees were not union records. Viewing the evidence in the light most favorable to the government, we cannot say that the record is completely devoid of evidence to support the diametric conclusion.

It is uncontested that Mr. Briscoe initiated the associate membership program and that he circulated a letter on union letterhead stating that nonmembers of the Union needed to pay a $12 fee before picking up their loans. These fees were collected by union personnel. Loan applicants were told, on Briscoe's direction, that the fee was intended to defray the Union's cost of processing the loans. Mr. Briscoe, in fact, related to Mr. Glass of Sir Finance that he could charge the

fee to help defray the cost of use of the Union's facilities and administrative personnel. Certainly, the persons who paid the money believed that they were making a payment to the Union.

As we have already noted, *see supra* note 7, the record also supports the jury determination that the Chicago APWU was authorized to initiate associate memberships or to raise funds for its own expenses and purposes in any lawful manner. The secretary-treasurer of the National APWU testified that money collected by the local Union under an associate membership program belonged to the Union. Thus, because the money was collected for the stated purpose of defraying union costs, and because the money was intended for the Union, Mr. Briscoe's conviction under count 9, embezzlement of the associate membership fees, must stand. *See United States v. Vandenbergen,* 969 F.2d 338, 340 (7th Cir.1992); *United States v. Ford,* 462 F.2d 199, 201 (7th Cir. 1972).

■ Similarly, sufficient evidence exists to affirm Mr. Briscoe's conviction for destruction of the associate membership fee records in violation of 29 U.S.C. § 439(c). Under 29 U.S.C. §§ 431(b) and 436, the Chicago APWU was required to maintain and keep all records of the Union's financial operations, including all records of receipts and disbursements, whether or not the money received and disbursed belonged to the Union. *See United States v. Budzanoski,* 462 F.2d 443, 449–52 (3d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972). There is no contention that the associate membership fees were not received by the Union; thus the associate membership fee receipts should have been maintained and filed.

Mr. Briscoe submits, without citation to authority, that these records need not be maintained and kept because the evidence demonstrates that the Union failed to file yearly fiscal reports, termed "LM2s," which

ing the intangible rights theory rendered invalid by *McNally,* reversal is not necessary when a jury, in order to convict, was nonetheless required by the indictment and instructions to find that a defendant fraudulently deprived a victim

of property and money; the conviction could be upheld under the wire fraud statute. *See also United States v. Eckhardt,* 843 F.2d 989, 997 (7th Cir.), *cert. denied,* 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988).

would have relied on these fee records. We cannot accept this contention. Pursuant to the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 439 *et seq.*, unions are required to file an annual report with the Secretary of Labor disclosing all receipts and disbursements for all financial operations of any kind. Under 29 U.S.C. § 436, the union is required to maintain and keep all records of the financial operations for a period of five years from the date at which the union files its annual report regarding those operations. *See Budzanoski*, 462 F.2d at 449–52. Section 439(c) criminalizes the willful destruction of such records. Accordingly, Mr. Briscoe was legally obligated to maintain and keep, rather than to destroy, the receipts for the associate membership fees.

### 2.

 Briscoe next submits that insufficient evidence exists to support his conviction under 29 U.S.C. § 503 for making a loan to himself from Union funds in excess of $2,000.[12] Mr. Briscoe contends that there was no specific evidence to prove beyond a reasonable doubt that he knew his conduct was contrary to law. Mr. Briscoe claims, relying on *Ratzlaf v. United States*, —— U.S. ——, ———–——, 114 S.Ct. 655, 658–59, 126 L.Ed.2d 615 (1994), that we must apply a willfulness standard that requires the establishment, before conviction, that the defendant knew of the legal restriction, yet still continued with the prohibited activity. We disagree.

 The Court acknowledged in *Ratzlaf*, —— U.S. at ——, 114 S.Ct. at 655, that " '[w]illful' ... is a 'word of many meanings,' and 'its construction [is] often ... influenced by its context.' " (citing *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943)). The Court added that a "term appearing in several places in a statutory text is generally read the same way each time it appears." *Id.* at ——, 114 S.Ct. at 660. In the case at hand, "willful" con-

duct, for purposes of the misdemeanor provisions of the Labor–Management Reporting and Disclosure Act, is defined as conduct done with reckless disregard of the law, i.e., no reasonable effort is made to determine whether the conduct would constitute a violation of the law. *See United States v. Budzanoski*, 331 F.Supp. 1201, 1205 (W.D.Pa.1971), *aff'd*, 462 F.2d 443, 452 (3d Cir.1972); *see also United States v. Ryan*, 350 U.S. 299, 305, 76 S.Ct. 400, 100 L.Ed. 335 (1956). The jury instructions proffered at trial were consistent with—arguably more stringent than—this standard.[13]

The record demonstrates that Mr. Briscoe's guilt was established under this standard. Mr. Briscoe had been active in Union affairs since the 1960s and had attended at least one seminar on the fiduciary responsibilities of union officers between 1982–88. Additionally, viewing the evidence in the light most favorable to the government, the jury had sufficient evidence to conclude that Mr. Briscoe knew the illicit nature of his $20,000 salary advance. Contrary to Mr. Briscoe's contention, the method of disbursement indicated that he was aware of the illegal nature of his loan. Mr. Briscoe recorded the $13,600 check to the IRS for his personal delinquent 1986 tax obligation in the Union ledger as "penalties and interest expense, IRS." No reference was made to Mr. Briscoe in that entry, and the entry appeared to be an IRS payment for a union-incurred expense. The second check for $6,400 was recorded as an advance to Mr. Briscoe. We are satisfied that the record contained sufficient evidence to permit the jury to reach a determination of willfulness.

### 3.

As a final matter, Mr. Briscoe asserts that his convictions for tax evasion and willful failure to file a tax return for 1984 (counts 12 and 13), in violation of 26 U.S.C. §§ 7201 and 7203, and filing a false tax return for 1986

---

**12.** 29 U.S.C. § 503(a) provides:

No labor organization shall make directly or indirectly any loan or loans to any officer or employee of such organization which results in a total indebtedness on the part of such officer

or employee to the labor organization in excess of $2,000.

**13.** "An act is done willfully if done voluntarily and intentionally with the purpose of avoiding a known legal duty." Tr. 172–20 at 3918.

(count 15), in violation of 26 U.S.C. § 7206(1), should be reversed for insufficiency of the evidence. Again, we find sufficient evidence of record, considering the evidence in the light most favorable to the government, to uphold Mr. Briscoe's convictions.

First, in regard to the evasion of taxes for 1984, Mr. Briscoe does not dispute that he acted willfully, that a tax deficiency exists, and that proof, beyond a reasonable doubt, of any one of the alleged affirmative acts in the indictment is sufficient to support a conviction. *See United States v. Mackey*, 571 F.2d 376, 387 (7th Cir.1978). The record contains evidence that the associate membership fees were collected on the direction of Briscoe, that he insisted that the fees be paid in cash, and that the cash and receipts be given to him at the end of each business day. Such evidence is adequate to support an act of tax evasion. *See Spies v. United States*, 317 U.S. at 499–500, 63 S.Ct. at 368; *United States v. Conley*, 826 F.2d 551, 556–57 (7th Cir.1987). The evidence of record also permits a jury determination that Mr. Briscoe personally destroyed copies of fee receipts. Neither Mr. Briscoe nor the Union could produce 1984 fee receipts in response to grand jury subpoenas issued in 1987 and 1988, despite the fact that Mr. Briscoe had control over the fee receipts. Finally, as discussed earlier, evidence exists that, pursuant to the agreement Mr. Briscoe made with the president of Sir Finance, he received $23,775 in 1984.

Next, Mr. Briscoe submits that evidence from the IRS that he failed to file a return in 1984 is insufficient to support a conviction for willful failure to file a return because it might simply indicate an error in IRS records, or error of the U.S. Postal Service. However, Mr. Briscoe improperly focuses on only a small portion of the evidence used to support his conviction. The government presented evidence chronicling Mr. Briscoe's filing history from 1976–1987. The evidence indicated that in every year, with the exception of 1986, in which Briscoe owed taxes beyond his withholding, he failed to file or filed late.[14] Mr. Briscoe's filing

history demonstrated that he knew that he had an obligation to file and that he intentionally ignored that obligation. *See United States v. Shelton*, 669 F.2d 446, 459 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Contrary to Mr. Briscoe's assertion, there was no evidence of record to support the contention that he filed a 1984 tax return. Rather, the evidence showed that Mr. Briscoe deceived his accountant when he told him that he filed returns for 1982–84.

Finally, Mr. Briscoe asserts that there did not exist sufficient evidence to convict him of filing a false income tax return for the 1986 calendar year. At trial, however, the government presented evidence that Mr. Briscoe's adjusted gross income did not include $40,638 derived from an assortment of associate membership fees ($27,048), bowling tournament receipts ($7,595), and other minor outlays. The failure to include any one of these income items on his return is sufficient to sustain Briscoe's conviction for filing a false federal income tax return. *See United States v. Scott*, 660 F.2d 1145, 1157 (7th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). For example, in 1986, the Union sponsored a bowling tournament in which $7600 in cash entry fees were collected and given to Mr. Briscoe. He kept the money and never deposited the money in union bank accounts.

Mr. Briscoe asserts that, other sources of income aside, because there was no evidence that he deposited the cash from the associate membership fees in his accounts, or that he spent such money, the money could not be considered income. However, at trial, the government demonstrated that he received the money. The government did not need to show how the money was used after its receipt. *See United States v. Martin*, 525 F.2d 703, 707 (2d Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975). Embezzled money is attributable as income to the embezzler in the year in which the embezzlement is carried out, regardless of what happens to the money after it is misappropriated (includ-

---

**14.** Mr. Briscoe failed to file in 1983 and 1984.

ing its possible future use for repayment). *United States v. Lippincott,* 579 F.2d 551, 552 (10th Cir.), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978); *see also Wood v. United States,* 863 F.2d 417, 419 (5th Cir.1989); *see generally Cruea v. Commissioner,* 50 T.C.M. (CCH) 1377, 1985 WL 15178 (1985). After review of the record, we believe the jury was entitled to conclude that the associate membership fees were property of the Union, and such fees were misappropriated by Briscoe.

## C. *Sentencing Guideline Issues*

### 1.

 Mr. Briscoe first argues, in regard to his sentence, that the trial court improperly calculated the total monetary loss to the Union and its members from his fraud. He submits that there was no evidence to establish that the Union and its members suffered any monetary loss due to his arrangement with Sir Finance, and that the district court erroneously considered certain conduct as relevant for sentencing purposes. We review a district court's factual findings regarding relevant conduct for sentencing purposes for clear error. *United States v. Bolin,* 35 F.3d 306, 309 (7th Cir.1994); *United States v. Vopravil,* 891 F.2d 155, 157 (7th Cir.1989). Thus, we will only reverse if we are left with the definite and firm conviction that a mistake has been made. *United States v. Gilbert,* 45 F.3d 1163, 1165 (7th Cir.1995). We review the district court's interpretation of the sentencing guidelines, however, de novo. *United States v. Fones,* 51 F.3d 663, 665 (7th Cir.1995).

The district court, to determine Mr. Briscoe's sentence, grouped together all of the U.S.S.G. offenses for which Mr. Briscoe was convicted: wire fraud (counts 6–8), embezzlement of union funds (count 9), and destruc-

tion of union records (count 11). It then calculated the total monetary loss to the. Union. Mr. Briscoe received $120,507 from the kickbacks from Sir Finance, $84,528 from the associate membership fees and $12,443 from two union sponsored bowling tournaments. Also included was $4,800 that Mr. Briscoe had the Union pay to cover his personal litigation expenses with the FDIC, and $28,-000 paid in interest, on a $15,000 loan from Mr. Briscoe's friend, by the Union at an exorbitant rate of interest. The total loss to the Chicago APWU and its members was $250,278. Therefore, the court added seven points to Mr. Briscoe's offense level pursuant to U.S.S.G. § 2F1(b)(1)(H).[15]

 We have stated earlier that the associate membership fees, as well as the kickbacks received from Sir Finance, represent money that should have gone to the Union. The aggregated amount of money represented the consequence of Mr. Briscoe's scheme to defraud the Union of its money and property. As such, the court properly exercised its discretion and aggregated the amounts to determine his sentence. *See United States v. Cole,* 988 F.2d 681, 685 (7th Cir.1993). Additionally, this aggregated amount likely represents, at minimum, the net detriment to the Union, and therefore the court properly used the amount to figure Mr. Briscoe's sentence.[16] *See United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992). Finally, we do not believe that the district court improperly grouped the multiple losses in different counts to determine Briscoe's sentence. Guideline § 1B1.3(a)(2) (1987) provided that "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" should be considered in determining the appropriate offense level. *See* U.S.S.G. § 3D1.2(d). Accordingly, the district court

---

**15.** U.S.S.G. § 2F1.1(b)(1)(H) (1987) provided in relevant part:

§ **2F1.1.** *Fraud and Deceit*
(a) Base Offense Level: 6
(b) Specific Offense Characteristics
 (1) If the loss exceeded $2,000, increase the offense level as follows:

 . . . . .

 (H) $200,001–$500,000 add 7

**16.** At least three union secretaries spent approximately 90% of their working time processing loan applications from 1984 to 1987. During that period, those same secretaries were paid $81,427. Other additional union resources were used during this time. Further, as we have stated earlier, we cannot determine how much more revenue the Union would have gained if Mr. Briscoe had not pocketed the "associate member" fees and not taken a kickback.

did not err in aggregating monetary losses for purposes of determining the offense level for Mr. Briscoe. *See United States v. Mullins,* 971 F.2d 1138, 1143 (4th Cir.1992).

### 2a.

■ Mr. Briscoe next submits that the district court improperly added four points to his offense level for his leadership role in the offense. He additionally contends that the district court improperly added two additional points for "more than minimal planning," ultimately resulting in double counting between this enhancement and the leadership enhancement. We review the district court's determination of the defendant's role in the offense for clear error. *United States v. Michalek,* 54 F.3d 325, 329 (7th Cir.1995).

The district court enhanced the offense level by four points based on its finding that Briscoe was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (1987). Mr. Briscoe first submits that Glass, not himself, was the leader or organizer. However, the record clearly supports a leadership finding: Briscoe solicited and obtained the payments from Sir Finance; Briscoe directed and controlled the assessment and collection of the associate membership fees; Briscoe destroyed the Union records to conceal his fraud; and Briscoe had the Union illegally loan him, and in one case his friend, money. The record demonstrates that Mr. Glass, while originating the concept of the loan program, did not create the associate membership or kickback schemes.

■ Mr. Briscoe submits that the district court improperly increased the offense level because only three people were involved in the scheme—Briscoe, the union secretary-treasurer, and Abram Shy Glass—and because the scheme was not extensive. However, the record clearly supports the enhancement. We have noted in previous cases that, in order for an enhancement under U.S.S.G. § 3B1.1 to be justified under the "otherwise extensive" language[17] of the guideline, the district court must point to "some combination of participants and outsiders equaling a number greater than five" if the "district court intends to rely solely upon the involvement of a given number of individuals to support" the finding. *United States v. Tai,* 41 F.3d 1170, 1174–75 (7th Cir.1994). In this case, the district court identified more than five individuals who were involved in the scheme, knowingly or unknowingly. Mr. Briscoe, Ms. Bell, the union secretary-treasurer, and Mr. Glass participated in the scheme, as Mr. Briscoe readily acknowledges. Additionally, however, the court identified at least eight union employees who participated in the collection of the associate membership fees as unknowing outsiders. This number includes the five union secretaries who were instructed to collect the cash fees and turn them over to Mr. Briscoe at the end of the day. However, the number of participants was not the sole factor on which the district court relied to increase the base offense level.

■ As Judge Cudahy recognized in *Tai,* 41 F.3d at 1175, "[d]istrict courts are still free to examine factors in addition to a headcount to justify a finding that a given criminal activity is otherwise extensive." *See also United States v. McKenzie,* 922 F.2d 1323, 1329 (7th Cir.), *cert. denied,* 502 U.S. 854, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). The district court acknowledged the fifty-nine fraudulent payments Briscoe received from Sir Finance in addition to the cash fees he received daily. This evidence of repeated transactions constitutes extensive activity for purposes of the Guidelines. *See id.; see also United States v. Dietz,* 950 F.2d 50, 53 (1st Cir.1991).

---

17. We emphasize for clarity that we are considering the number of participants and outsiders involved in the scheme under the phrase "otherwise extensive" contained in § 3B1.1. U.S.S.G. § 3B1.1, comment. (n. 1) states that a " 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Thus, for a conviction to be appropriate under the phrase "five or more participants" in § 3B1.1(a), all the people involved need to be "criminally responsible." However, under the language "otherwise extensive," all persons involved during the course of the entire offense are to be considered. *See* U.S.S.G. § 3B1.1, comment. (n. 2).

## 2b.

 We do not accept Mr. Briscoe's proposition that the district court's two-point enhancement for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2) resulted in improper double counting because the four point leadership role in an "otherwise extensive" criminal scheme enhancement already considered the duration of the illicit activity. Rather, the enhancement for more than minimal planning involves the consideration of factors (focusing on the nature of the offense) not assessed in consideration of an enhancement for leadership of an extensive criminal enterprise (factors focusing on the size of the scheme and the defendant's relative culpability). Leading does not implicate necessarily planning, and as such, those two activities are distinct aspects of criminal conduct that should be considered separately to preserve the intent of the Sentencing Commission. *United States v. Michalek*, 54 F.3d at 333 & n. 14 (collecting cases); *United States v. Smith*, 13 F.3d 1421, 1429 (10th Cir.), *cert. denied*, ─── U.S. ───, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994); *United States v. Boula*, 932 F.2d 651, 654–55 (7th Cir.1991).

The guidelines state that more than minimal planning "is deemed present in any case involving repeated acts over a period of time" and/or in any case in which "significant affirmative steps were taken to conceal the offense." U.S.S.G. § 1B1.1, comment. (n. 1(f)). Unquestionably, the record supports such an enhancement. Mr. Briscoe engaged in a protracted course of conduct that served to conceal the actual nature of the kickbacks and associate membership fees given to him. Mr. Briscoe had Sir Finance issue kickback checks to dormant non-personal bank ac-

counts in which he was a signatory, proffered false statements to union members about the use of the membership fees, and had the cash fee receipts turned over to him for later destruction. He further had the union issue checks to cover his personal obligations without explicitly noting the purpose of such disbursements in the union ledgers.[18]

## 3.

 As a final matter, Mr. Briscoe submits that the district court's two point enhancement for obstruction of justice for destroying records was improper in light of the separate charge (count 11) which alleged the same destruction of such records.[19] We review such a contention, a matter of Guidelines interpretation, de novo. *United States v. Lozoya–Morales*, 931 F.2d 1216, 1218 (7th Cir.1991).

Mr. Briscoe admits that his conviction for destroying union records was grouped by the district court with the other mail, wire, and embezzlement convictions. *See* U.S.S.G. § 3D1.2. Under § 3D1.3(a), "the offense level applicable to [such] a Group is the offense level ... for the most serious of the counts comprising the Group...." Section 3D1.5 instructs courts to use this offense level to calculate the total punishment range. Accordingly, the offense level of the grouped offenses was that level of the most serious offense—mail and wire fraud; the destruction of union records did not affect the offense level calculus. Thereafter, the two-point enhancement for obstruction of justice was added to the offense level taken from the mail and wire fraud conviction.[20] The court's subsequent two-point upward adjustment for obstruction of justice did not constitute dou-

18. *See United States v. Brown*, 47 F.3d 198, 205 (7th Cir.1995) (indicating that "duration and nature" of scheme were relevant factors in considering whether extensive planning occurred); *United States.v. Bean*, 18 F.3d 1367, 1370 (7th Cir.1994) ("The right question to ask is whether [the] offense involved more planning than is usual for ... fraud. Recall that the note to § 1B1.1 speaks of more planning 'than is typical for commission of the offense in its simple form.' The 'offense' is the crime of which the defendant has been convicted, not of the particular way in which he committed it.").

19. Mr. Briscoe states in his brief in this court:

The Defendant was convicted of Count 11 of the indictment for destruction of the receipts for the associate membership fees. The Court calculated that count as a level 17 and grouped that count with the others.

Despite the fact that the destruction of the receipts was treated and calculated as a separate count of conviction, the court also added a 2 point enhancement for obstruction of justice to the mail fraud, embezzlement, and destruction of records calculations.

Appellant's Br. at 43.

20. The procedures taken by the district court, consistent with the Guidelines, generally avoids "double counting" because the grouping of ob-

**592**

ble counting because it was used to enhance only the mail and wire fraud offense.[21] We have approved of such sentencing procedures under later versions of the Guidelines. *See, e.g., United States v. Maggi*, 44 F.3d 478, 482 (7th Cir.1995); *United States v. Giacometti*, 28 F.3d 698, 703–04 (7th Cir.1994).

The record contains sufficient evidence to support the determination that Mr. Briscoe destroyed union records after a criminal investigation was initiated, therefore impeding the investigation and prosecution of the case. The trial record reflects that Mr. Briscoe destroyed associate membership fee records as late as August 1987. Mr. Briscoe had been personally served with a grand jury subpoena requesting such records by June 30, 1987, and Briscoe had been served with a subpoena to appear personally before the grand jury by August 5, 1987. *See* U.S.S.G. § 3C1.1. The enhancement, therefore, was appropriate.

### Conclusion

For the foregoing reasons, we affirm the conviction and sentence of Mr. Briscoe.

AFFIRMED.

---

struction counts with closely-related counts prevents sentencing courts from simply summing the base offense levels of the obstruction and non-obstruction counts. *See* U.S.S.G. § 3D1.2, comment. (n. 5) (1987).

21. Section 3C1.1, comment. (n. 4) (1987), contrary to Mr. Briscoe's suggestion, prohibits the two-point enhancement for only five specific offenses. Destruction of union records, in violation of 29 U.S.C. § 439(c), is not one of the enumerated offenses.