UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                            No. 01-4329

MARCIA KIRVEN MCNEIL,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CR-00-220-S)

Argued: June 6, 2002

Decided: August 26, 2002

Before WIDENER and WILKINS, Circuit Judges, and
Frederick P. STAMP, Jr., United States District Judge for the
Northern District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Thomas McCarthy, Sr., Annapolis, Maryland, for Appel-
lant. Virginia B. Evans, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:**
Thomas M. DiBiagio, United States Attorney, Robert R. Harding,
Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Marcia Kirven McNeil was charged with mail and wire fraud in seven counts of an 18 count indictment stemming from a fraudulent real estate flipping scheme in Baltimore. A jury convicted her of five counts. She appeals her convictions alleging, *inter alia*, that the evidence of the existence of a scheme to defraud was insufficient to convict her. We affirm.

Mrs. McNeil's sole assignment of error is that "[t]he denial by the trial court of Appellant's Motion for Judgment of Acquittal at the conclusion of the Government's Case, is error." (Br. p.i; see also Br. p.1.) This assignment of error is approached in various ways with more or less precision throughout the brief. In such a case, however, we review the whole record. *United States v. Heller*, 527 F.2d 1173 (4th Cir. 1975); *United States v. Stradley*, 295 F.2d 33, 35 (4th Cir. 1961).

Marcia McNeil, Carl Schulz, Thomas Mayer, and Angus Finney, among others, instigated a scheme to flip properties in economically depressed areas of Baltimore.[1] The essence of the scheme was to buy large numbers of very inexpensive properties and resell them at greatly inflated prices, sometimes using the mortgage secured for the second purchase to finance the initial purchase. The fraud occurred through various efforts of Mrs. McNeil and her partners to convince mortgage companies and third-party purchaser/borrowers into buying

---

[1]A general description of what is called a criminal flipping scheme includes a buyer acquiring title or right to title to a property and then selling it to a second buyer at an increased price without disclosing on record the first buyer's true interest in the property. The illegality in the transaction comes from false representations as to value, or use, or tenancy, or condition, or like things which affect value or credit worthiness.

the properties. Mrs. McNeil and her cohorts would serve as mortgage brokers aiding interested third-parties in securing financing for the properties. Often, the third-party purchaser/borrowers would not have sufficient income, cash, or credit history to secure mortgages for the properties they wished to purchase. Mrs. McNeil would create loan documents containing misrepresentations of the applicant's income, down payment, and the presence of seller second mortgages inducing lenders into furnishing the necessary funds for the second purchase of the properties. Third-party purchaser/borrowers were induced into the transactions through misrepresentations of the condition of the properties, potential for generation of rental income, and presence of rent paying tenants. For some transactions, McNeil used her company, Atlantic Investment Group, to contract for the purchase of groups of properties and then prepared and submitted loan applications on behalf of herself, which resulted in the issuance of mortgage loans covering both AIG's purchase and her own. However, since Mrs. McNeil's purchases were not recorded until after settlement, the lenders did not know they were financing two separate purchases of the properties and further that the original purchase price was a fraction of the second price.

Mrs. McNeil was convicted by jury on five counts of seven in which she was charged in the eighteen-count indictment. Because the district court granted the motion of judgment of acquittal of the appraisers, she contends that there was no scheme to defraud as required by the mail and wire fraud statutes, thus her convictions must be overturned. She maintains that even if a scheme to defraud was present, the government did not prove that there was a victim of the scheme. Finally, she argues that there is insufficient evidence to support her convictions as to the knowledge elements of wire fraud.

Mrs. McNeil's first contention is that the acquittal of the appraisers removed the object of the scheme to defraud, that of generating profit for the participants through the use of fraudulent appraisals. She argues that she could not be guilty of mail or wire fraud because the dismissal of the charges against the appraisers removed the pall of illegality from the appraisals she used in the loan documents. We think this contention is not well taken.

Mrs. McNeil's argument here is based on Paragraphs 15 and 28 of the indictment, which read as follows:

15.   It was further part of the scheme and artifice to defraud that, in order to make a profit, SCHULZ AND McNEIL had to obtain mortgage funds in excess of their own costs in acquiring and selling the properties. They also had to adjust their contract sales prices because the mortgage lenders would typically finance only a percentage (60 to 90%) of the contract sales price. In order to justify profitable contract sale prices to the mortgage lenders, SCHULZ AND McNEIL arranged for appraisals that were close to the contract sales prices. The appraisals were often prepared by defendant GUY SHANEYBROOK through Allied Appraisal Associates, Inc., and NARADE PRAMUAN through DP Appraisal, Inc. The appraisals of SHANEY-BROOK and PRAMUAN contained a variety of false, misleading and fraudulent statements and representations. . . . SHANEYBROOK and PRAMUAN prepared these false and fraudulent appraisals knowing that they would be supplied to: a) purchaser/borrowers, b) lenders to convince them to provide mortgage financing so the sales to the purchaser/borrowers would be consummated, and c) to the loan purchasers to convince them to purchase the mortgage loans.

28.   It was also part of the scheme and artifice to defraud that at settlement, the settlement agent would distribute the mortgage funds so that SCHULZ, McNEIL, SHANEY-BROOK, and PRAMUAN . . . would receive fees, payments, and proceeds for their respective roles in the property transaction.

The elements of mail fraud are 1) the existence of a scheme to defraud, 2) the use of the mails for the purpose of executing the scheme, and 3) materiality of any misrepresentations.[2] See 18 U.S.C.

_____

[2]The relevant portion of the mail fraud statute provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempt-

§ 1341; *Neder v. United States*, 527 U.S. 1, 23-25 (1999); *United States v. Goodwin*, 272 F.3d 659, 666 (4th Cir. 2001). The elements for wire fraud differ only in the method of executing the scheme through a wire communication rather than the mails.[3] 18 U.S.C. § 1343. In order to establish the scheme to defraud, the government must prove that Mrs. McNeil acted with the specific intent to defraud. *Goodwin*, 272 F.3d at 666.

In granting Shaneybrook and Pramuan's motions for judgments of acquittal, the district court accepted Schulz's testimony that he did not push the appraisers to attach a specific dollar figure to the subject property. Rather, the court found as follows:

> "[t]hey said, here's what we would like to get. . . . And the appraisers went and looked. . . . Now if they're at the outer fringe of [their professional judgment], maybe that's something they should be . . . called to account for in terms of their licensure . . . but it doesn't make them a participant with the requisite degree of criminal knowledge in the scheme that's charged in the indictment."

The district court's decision was based on the fact that the appraisers

---

> ing so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined . . . or imprisoned . . . , or both.

18 U.S.C. § 1341.

[3]The wire fraud statute provides, in relevant part

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343.

did not have specific knowledge of Schulz and Mrs. McNeil's plan to use the appraisals to commit fraud in the sale of the subject properties, thus they did not have the specific intent required for conviction. The ruling was not based on some notion that the appraisals were correct, much less that a scheme to defraud did not exist. This exposes the central flaw in Mrs. McNeil's argument: the existence of a scheme to defraud in this case does not require that the actual production of the appraisals was in some way criminal. Cf. *United States v. Klein*, 515 F.2d 751, 754 (3rd Cir. 1975) (reversing conviction where public fire insurance adjuster had knowledge of arson, but government presented no evidence as to his knowledge that proof of loss forms would be used to defraud insurance companies). The government must prove a scheme to defraud, but is not required to prove every act charged in the indictment in the scheme to defraud, providing that one or more of them be proven. *United States v. Briscoe*, 65 F.3d 576, 585 (7th Cir. 1995). A false, misleading, or, fraudulent appraisal is but one tool that Mrs. McNeil could have used to induce innocent purchasers or lenders into the transactions, and in fact, many more misrepresentations unconnected to the appraisals were alleged in the indictment and proven, as we have set out above. Therefore, we are of opinion that the acquittal of the appraisers does not entitle Mrs. McNeil to reversal of her convictions because the scheme to defraud and her role in it did not necessarily depend on whether or not of the appraisers knew of her illegal plan.

Mrs. McNeil next challenges the sufficiency of the evidence supporting her convictions. The first aspect of her sufficiency challenge relates to the government's proof regarding intended victims of the wire fraud, while the second relates to the government's proof regarding intent to further the scheme to defraud through the use of the wires. A jury verdict must be sustained if there is substantial evidence supporting it. *Glasser v. United States*, 315 U.S. 60, 80 (1942). Upon a review for sufficiency of the evidence "if the record reflects that the Government presented substantial evidence from which a reasonable jury could convict, we must uphold the verdict." *United States v. Godwin*, 272 F.3d 654, 666 (4th Cir. 2001). We will discuss each of McNeil's contentions in turn and find both to be without merit.

The argument goes that her conviction on Counts 8, 9, 12, 14 and 16 "cannot be sustained because the Government has failed to identify

an intended victim of the alleged fraud." While it may be true that the government called only one of the lenders connected with Counts 8 and 9, to say that his company had been defrauded, it was not necessary to prove success of the schemes in each case to sustain a conviction. This is not even to suggest that the facts surrounding the charge in each of those counts were above board, far from it as the record reveals. The crux of mail or wire fraud is the execution of a scheme to defraud, and the scheme need not be successful in order to constitute a crime, see *United States v Bryan*, 58 F.3d 933, 943 (4th Cir. 1995) (citations omitted), and the government's proof regarding Mrs. McNeil's involvement in a scheme to defraud was ample. Indeed, her partners, Schulz and Finney, testified against her at her trial on the specifics of the fraudulent scheme. They detailed McNeil's preparation of loan documents containing numerous misrepresentations concerning the purchaser's income, credit history, and existence of seller second mortgages. In addition to her partner's testimony, lenders with respect to Counts 14 and 16 testified that they relied on her misrepresentations in making lending decisions, either as the original lender or as a purchaser on the secondary market. Three third-party purchasers testified to misrepresentations Mrs. McNeil made, including those regarding purchaser's income, rental income, and condition of the subject properties.

For example, among the many misrepresentations to which Mrs. McNeil was a party, there is evidence which tends to show the following: Count 8, 924 North Chester Street, Baltimore, Maryland: a deposit was reported on a contract signed by Mrs. McNeil, but the deposit did not exist; Count 9, 1340 Division Street, Baltimore, Maryland: A false lease between Mrs. McNeil and one Dubin was reported to show income to Mrs. McNeil; Count 12, 2357 Annapolis Road, Baltimore, Maryland (March 27, 1998): Mrs. McNeil represented she was Vice President of a company called Financial Solutions when, in fact, she was not. Count 14, 2239 Sidney Avenue, Baltimore, Maryland: A false statement of the purchaser's income was submitted on a paper, apparently a W-2 form, at Mrs. McNeil's request; Count 16, 2357 Annapolis Road, Baltimore, Maryland (December 2, 1998): The contract of sale reported a $2,500 down payment which was not made.

So the evidence against Mrs. McNeil in this respect was abundant.

Mrs. McNeil challenges the government's proof with respect to the use of wire communication. She argues that the government has not proven that she knew of the specific wire transfers that occurred, and that none of the wire transfers were on her behalf or knowingly caused by her, rather they were on behalf of or caused by lenders and banks involved in the transactions. Her argument fails because the government need only prove that the use of a wire communication or the mails was reasonably foreseeable. See *United States v. Edwards*, 188 F.3d 230, 233-4 (4th Cir. 1999). Here, the jury was correctly instructed in accordance with the law as follows:

> "It is not necessary for the defendant to be directly or per-sonally involved in the delivery by interstate carrier or wire communication, as long as such delivery or communication was reasonably foreseeable in the execution of the alleged scheme to defraud in which the defendant is accused of par-ticipating. . . .

> This does not mean that the defendant must have specifi-cally authorized others to make the delivery or transmission. When one does an act with knowledge that the use of the wires can reasonably be foreseen, even though not actually intended, then he causes the mails or wires to be used."

There was sufficient evidence for a reasonable jury to conclude in accordance with the above quoted instructions that someone in Mrs. McNeil's business of real estate purchase and sale could reasonably foresee that banks involved in a given transaction would transfer monies using the wires. There was evidence that wire transfers were a normal method for lenders to transfer money at the time of settle-ment. Mrs. McNeil was in the real estate business herself long before the facts underpinning the fraud involved here took place, which sup-ports the conclusion that a reasonable jury could find that the use of wire communication was reasonably foreseeable.

Accordingly, Mrs. McNeil's convictions for mail and wire fraud are

*AFFIRMED.*[4]

---

[4]On the mail fraud conviction, Count 16, McNeil states that the mortgage company sent the check for the purchase of the subject property via common carrier, and "the check does not appear to have crossed state lines." Appellant's Br. at 20. Assuming that this is a claim of error, we need only note that the mail fraud statute makes all mailings in furtherance of a scheme to defraud criminal, whether or not they cross state lines. See *United States v. Photogrammetric Services, Inc.*, 259 F.3d 229, 247 (4th Cir. 2001). In any event, the jury was correctly charged on mail fraud, in the same vein as it was charged on wire fraud as set out in this opinion, to which there was no objection. The evidence fully supports a verdict of guilty.