UNITED STATES of America, Plaintiff,

v.

Elliot NEUFELD, D.O., and
Jon Mickle, Defendants.

No. CR–2–94–144 (1).

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 27, 1995.

Roger Philip Sugarman, Robert Carl Schuler, Emens Kegler Brown Hill & Ritter, Columbus, OH, James Streicker, Chicago, IL, for Elliot Neufeld.

David Joseph Bosley, United States Attorney's Office, Columbus, OH, William Bowne, U.S. Department of Justice, Fraud Section, Washington, DC, for the U.S.

## *OPINION AND ORDER*

GEORGE C. SMITH, District Judge.

This matter is before the Court on defendant Neufeld's motion to dismiss the indictment. Since the filing of this motion the government filed an "Amended Superseding Indictment" and a "Second Superseding Indictment." Defendant Jon Mickle has not filed a motion to dismiss the indictment. This ruling addresses defendant Neufeld's motion to dismiss the indictment in light of the Second Superseding Indictment.

## I. Background

Defendant Dr. Neufeld is an osteopathic physician who has been licensed to practice medicine in the State of Ohio since 1975. Since the mid–1980s, Dr. Neufeld has focused his practice on treating HIV-positive patients and those afflicted with Acquired Immune Deficiency Syndrome ("AIDS"). Dr. Neufeld provides the primary care for more HIV/AIDS patients than any other physician in the Columbus area and he is a registered provider of Medicare and Medicaid services.

Medicare and Medicaid are medical insurance programs designed to ensure that the elderly, unemployed, self-employed and low-paid workers receive quality health care. Congress established Medicare under Title XVIII of the Social Security Act of 1965, 42 U.S.C. § 1395 *et seq.* Congress established Medicaid under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.* These programs cover the cost of home health care services and the purchase of durable medical equipment.

In late 1990, Caremark, a home infusion company, expanded its home health care services in the Columbus area to include treatment of AIDS patients. The company requested Dr. Neufeld's services as a consultant to assist in the development of treatment and educational programs for its staff and its patients. Dr. Neufeld was paid for services allegedly performed under these written Consulting Agreements. The payments he received pursuant to these agreements form the basis for the charges in the indictment.

Count one (1) of the indictment charges a conspiracy to violate the anti-kickback provisions of the Medicaid–Medicare Anti–Kickback statute ("Anti–Kickback statute"), 42 U.S.C. §§ 1320a–7b(b). Counts two through twenty-seven of the indictment charge Dr. Neufeld with substantive violations of the Anti–Kickback statute, 42 U.S.C. § 1320a–7b(b). Counts twenty-eight through thirty charge mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

## II. DISCUSSION

Dr. Neufeld moves to dismiss the indictment in its entirety or various counts thereof. He makes several arguments in support of his motion. Dr. Neufeld first contends that the indictment must be dismissed because all counts are premised on the Anti–Kickback statute which is unconstitutionally vague on its face and as applied to him. Dr. Neufeld further asserts that even if the Anti–Kickback statute is not vague, due process requires that the government be estopped from prosecuting him because he falls within a safe harbor provision of the Anti–Kickback statute. Finally, Dr. Neufeld contends that counts twenty-eight, twenty-nine and thirty of the Indictment must be dismissed because as mail and wire fraud counts, they fail in three separate respects to allege a violation by Dr. Neufeld.

The Court will first address Dr. Neufeld's vagueness argument.

### A. Vagueness of the Anti–Kickback Statute

The Anti–Kickback statute, 42 U.S.C. § 1320a–7b(b), represents a cumulation of several years of Congressional effort to combat fraud and abuse in the Medicare and Medicaid programs. Congress first enacted the Medicare–Medicaid Anti–Kickback laws in 1972. *See* Social Security Amendments Act, Pub.L. No. 92–603, §§ 242(b) (Medicare) and (c) (Medicaid), 86 Stat. 1419 (1972). This law made it a misdemeanor to solicit, offer, or receive "any kickback or bribe in connection with" furnishing covered services or referring a patient to a provider of those services. *Id.*

In 1977, Congress expanded upon the 1972 statute. Congress made violations of the statute a felony and additionally proscribed the solicitation or receipt of "any remuneration," including any kickback, bribe, or rebate, in return for referring a patient to a provider of covered services, regardless of whether the prohibited act was done "directly or indirectly," "overtly or covertly," or "in cash or in kind." Medicare–Medicaid Antifraud and Abuse Amendments, Pub.L. No. 95–142, 91 Stat. 1179, 1181 (1977).

A certain uneasiness with the application of the Anti–Kickback statute led Congress to revise the statute again in 1980:

> [Congress was] concerned that criminal penalties may be imposed under current law to an individual whose conduct, while improper, was inadvertent. Accordingly, the section clarifies current law to assure that only persons who knowingly and willfully engage in the proscribed conduct could be subject to criminal sanctions.

H.R.Rep. No. 96–1167, at 59, *reprinted in* 1980 U.S.C.C.A.N. 5526, 5572. The statute's additional scienter requirement specifically required that one "knowingly and willfully" perform a prohibited act to be found guilty of a violation. *See* Omnibus Reconciliation Act of 1980, Pub.L. No. 96–499, 94 Stat. 2599, 2625 (1980) (codified as amended at 42 U.S.C. § 1395nn(b)(1)).

In 1987, Congress streamlined the Anti–Kickback statute into a single statutory scheme, codified at 42 U.S.C. § 1320a–7b(b). This is the current version of the statute and provides in relevant part:

> (1) [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, for cash or in kind—
>
>> (A) in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare or Medicaid] or a State health care program, or
>>
>> (B) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made under [Medicare or Medicaid] or a State health care program,
>
> shall be guilty of a felony ...

*Id.*

Dr. Neufeld contends that the Anti–Kickback statute does not give fair warning of the standards by which his conduct is to be judged. He asserts that the statute is vague on its face as well as applied to his alleged conduct. Although previous versions of the Anti–Kickback statute have been upheld on vagueness challenges in this Circuit, *see United States v. Tapert,* 625 F.2d 111, 121–22 (6th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980); *United States v. Perlstein,* 632 F.2d 661, 662 n. 1 (6th Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981), Dr. Neufeld submits that revisions to the statute and recent Supreme Court pronouncements limit the precedential value of these decisions.

■ The Supreme Court has held that a "criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952); *see also Posters 'N' Things, Ltd. v. United States,* —— U.S. ——, ——, 114 S.Ct. 1747, 1754, 128 L.Ed.2d 539 (1994); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). A facial vagueness challenge which does not implicate constitutionally protected conduct, however, will only lie if the statute "is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *see also United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of facts of the case at hand."). In light of *Hoffman Estates* and *Mazurie,* the Court observes that a facial vagueness analysis is not necessarily warranted given that Dr. Neufeld does not contend that the Anti–Kickback statute infringes upon his constitutional liberties. The Court, nonetheless, will proceed in an analysis of the Anti–Kickback statute for facial vagueness. *See, e.g., Hanlester Network v. Shalala,* 51 F.3d 1390, 1399–1400 (9th Cir.1995); *Tapert,* 625 F.2d at 121–22 (addressing an earlier version of the statute).

■ The Supreme Court has enumerated four factors that must be considered in conducting a vagueness inquiry: (1) does the statute regulate economic activity; (2) does it contemplate civil or criminal penalties; (3)

does it contain a scienter requirement; and (4) does it threaten any constitutionally protected rights? *Posters 'N' Things,* —— U.S. at ——, 114 S.Ct. at 1754; *Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. at 1193–94.

■ After careful consideration of the four factors, the Court does not find 42 U.S.C. § 1320a–7b(b) to be unconstitutionally vague on its face. While the statute does provide for criminal penalties, all other factors mitigate against a facial vagueness challenge. First of all, the statute regulates economic activity which is "subject to a less strict vagueness test." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193. Moreover, the statute does not implicate constitutionally protected rights and contains a heightened scienter requirement.

The heightened scienter standard of the Anti–Kickback statute requires that the government prove that the defendant "knowingly and willfully" accept renumeration "in return for" referrals. 42 U.S.C. § 1320a–7b(b). The Supreme Court in *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) acknowledged that " 'willful' ... is a 'word of many meanings,' and 'its construction [is] often ... influenced by its context.' " *Id.* at ——, 114 S.Ct. at 659 (citing *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943)). Indeed, two separate delineations of the word have arisen in legal nomenclature. *See* Rachel Simonoff, *Ratzlaf v. United States: The Meaning of "Willful" and the Demands of Due Process,* 28 Colum.J.L. & Soc.Probs 397, 397 (1995) ("The first interpretation requires merely a purpose or willingness to commit the act. The second requires, in addition, an intent to violate the law itself."). The Supreme Court in *Ratzlaf* did not alter "the venerable principle that ignorance of the law generally is no defense to a criminal charge" *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663, but recognized that in certain contexts, "Congress may decree otherwise." *Id.*

The Supreme Court in *Ratzlaf* held that "willful" violation of the Anti–Structuring statute, 31 U.S.C. §§ 5322(a), 5324(a)(3), requires the government to show that the defendant acted with knowledge that his conduct was unlawful. *Id.* at ——, 114 S.Ct. at 659. There were two distinct grounds for this holding. First was the statutory language itself, which, because of its parallel criminal and penalty provisions, required a definition of "willful" as encompassing something more than mere purpose. *Id.* Second was the Supreme Court's finding that monetary structuring was not so obviously illegal to inherently satisfy the "willfulness" requirement. *Id.* at ——, 114 S.Ct. at 662.

The first ground was the statutory language. There were two statutory provisions at issue in *Ratzlaf,* the first criminalizing conduct, and the second punishing that conduct. 31 U.S.C. § 5324(a)(3) barred transactions structured "for the purpose" of evading certain federal financial reporting requirements, while 31 U.S.C. § 5322(a) set out punishments for "willfully violating" the statute. The Supreme Court held that failure to read knowledge of illegality into section 5322 would render the "purpose" language of section 5324 mere surplusage. *Id.* at ——, 114 S.Ct. at 659.

The second ground for finding that knowledge of illegality was required for a "willful" violation of the statute in *Ratzlaf* was that the act of structuring was innocuous enough to be treated as innocent conduct, and that "willfulness" was not satisfied with mere purposeful conduct. Specifically, the Supreme Court rejected the government's contentions that "structuring is so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring." *Id.* at ——, 114 S.Ct. at 662.

Although Dr. Neufeld contends that the facial vagueness challenge to the Anti–Kickback statute must stand or fall on an adoption of a "willfulness" standard similar to that found in *Ratzlaf, Ratzlaf*'s analysis is neither useful nor applicable to the question of the scienter standard for the Anti–Kickback statute. Neither resort to the statutory language, the underlying nature of the offense, nor the relevant legislative history yields a definition of "willful" which is beyond the ordinary call of the word in legal parlance.

Resort to the statutory language does not lend support to the definition of "willful" in the Anti–Kickback statute as requiring a knowledge of illegality. The current language of the statute requires that the defendant "knowingly and willfully" solicit bribes for referrals. Unlike the statute under consideration in *Ratzlaf,* there are not parallel provisions which would require treatment of one scienter requirement as mere surplusage. Each term in the statute is self-contained and relevant to the mens rea which the government must prove.

Furthermore, the second factor which the Supreme Court in *Ratzlaf* considered in its decision—the inherent unlawfulness of the prohibited conduct—weighs against adopting a standard of "willfulness" for the Anti–Kickback statute which requires a knowledge of illegality. The *Ratzlaf* decision notes that financial structuring as tax avoidance is not so "obviously 'evil' " as to put individuals on notice that they must determine whether their fiscal planning goes astray from the law. —— U.S. at ——, 114 S.Ct. at 662. *See also Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1798, 128 L.Ed.2d 608 (1994) (holding similarly in the context of some firearms regulation).

The same, however, may not be said for soliciting payment for referrals. Such transactions may subject a physician to professional discipline in Ohio. Ohio Rev.Code Ann. § 4731.22(B) (Page 1994) ("Grounds for Discipline") in particular states that:

> The [State medical] board ... shall limit, revoke, or suspend a certificate [allowing the practice of medicine] for one ... of the following reasons: ...
>
> (4) Willfully ... receiving a thing of value in return for a specific referral of a patient to utilize a particular service or business.

*Id.* The Court is reluctant to recognize as "harmless" an activity for which a physician may be disciplined in Ohio and criminally prosecuted in other states; *see, e.g.,* Ariz. Rev.Stat. § 13–3713 (remunerated patient referral a felony when consideration exceeds $1,000); Cal.Lab.Code § 3215 (remunerated patient referral is "criminal conduct"); Col. Rev.Stat. § 12–36–125 (remunerated patient referral a misdemeanor); Ill.Rev.Stat. ch. 225, para 60/22.A(14) (remunerated patient referral grounds for disciplinary action); NY Educ.Law § 6530.18 (remunerated patient referral grounds for disciplinary action); Wash.Rev.Code § 19.68.010 (remunerated patient referral a misdemeanor). Taking bribes for referrals is not an innocent endeavor. It is an inherently wrongful activity and one of which a physician should particularly be aware.

Furthermore, resort to the legislative history does not compel a different interpretation. The relevant period of the Court's inquiry focuses on the 1980 amendments when the heightened scienter language was added to the statute. Following the legislative pronouncements in 1977, *see, e.g.,* 123 Cong.Rec. S31767 (daily ed. Sept. 30, 1977) (statement of Sen. Talmadge) (1977 amendments were "an opportunity for the Congress to give a clear, loud signal to the thieves and the crooks and the abusers that we mean to call a halt to their exploitation of the public and the public purse."), the trend in interpretation of the Anti–Kickback statute was toward liberal construction of the language. *See, e.g., United States v. Perlstein,* 632 F.2d 661 (6th Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981); *United States v. Ruttenberg,* 625 F.2d 173 (7th Cir.1980); *United States v. Hancock,* 604 F.2d 999 (7th Cir.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 521, 62 L.Ed.2d 420 (1979); *but see United States v. Zacher,* 586 F.2d 912 (2nd Cir.1978); *United States v. Porter,* 591 F.2d 1048 (5th Cir.1979).

Congress viewed the trend of current caselaw as failing to give physicians sufficient guidance and thus the 1980 amendments to the Anti–Kickback statute proposed limiting prosecutions under the statute to defendants who had acted with some degree of deliberation. *See* H.R.Rep. No. 96–1167, at 59, *reprinted in* 1980 U.S.C.C.A.N. 5526, 5572 (expressing a concern "that criminal penalties may be imposed under current law to an individual whose conduct, while improper, was inadvertent."). A concern for prosecuting those acting inadvertently, however, does not equate "willfulness" with knowledge of illegality nor mandate the availability of a defense of ignorance of the law.

While the Court is keenly aware of the Ninth Circuit's interpretation of the Anti–Kickback statute's scienter requirement, *see Hanlester Network v. Shalala,* 51 F.3d 1390, 1400 (9th Cir.1995) (defining the mens rea element as: "(1) know[ing] that § 1128(b) prohibits offering or paying renumeration to induce referrals, and (2) engag[ing] in prohibited conduct with the specific intent to disobey the law."), the Court declines to follow *Hanlester*'s adoption of the *Ratzlaf* definition for "willful." This does not mean that the Anti–Kickback statute is unconstitutionally vague. A formulation of "willful" which takes into account the purpose to commit a wrongful act is sufficient to eliminate the vagueness challenge. *See, e.g., United States v. Jain,* No. 94–00087–01, 1995 WL 9301, at *4 (W.D.Mo. Jan. 9, 1995) ("The instruction on willfulness [for the Anti–Kickback statute] ... requires only that [the] defendant ... acted 'unjustifiably and wrongfully' in taking prohibited referral fees, and knew that his conduct should be so characterized.")

The Court hesitates from embarking on an exact definition of the scienter requirement at this time, but holds that a definition of "willful" which comports with the true interpretation of the Anti–Kickback statute will eviscerate any claim of vagueness. The Court finds that Dr. Neufeld has not shown, for purposes of a facial vagueness challenge, that the statute is "impermissibly vague in all of its applications." *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. at 1191.

Dr. Neufeld next contends that the Anti–Kickback statute is unconstitutionally vague as applied to his particular conduct. The Supreme Court has held that an "as applied" vagueness challenge must fail if a person of ordinary intelligence upon review of the statute would understand that the alleged conduct is prohibited by the law in question. *Posters 'N' Things,* —— U.S. at ——, 114 S.Ct. at 1754; *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975).

The Indictment in this case charges that Dr. Neufeld "in return for" referring patients to Caremark for home infusion therapy "knowingly and willfully" solicited remuneration. Dr. Neufeld submits that the "in return for" language as applied to his particular conduct is unconstitutionally vague in that he performed substantial services in connection with his contractual arrangement with Caremark. Dr. Neufeld contends that if his conduct is made criminal through a non-*quid pro quo* referral, that the statute is void for vagueness as applied.

The Court finds that the Indictment's allegations comport with current interpretations of the statute and that Dr. Neufeld's contentions regarding his provision of services do not support his vagueness challenge. First of all, numerous courts have interpreted the "in return for" language to encompass situations where only one of multiple purposes of payment was to refer patients. *See, e.g., United States v. Kats,* 871 F.2d 105, 108 (9th Cir.1989); *United States v. Greber,* 760 F.2d 68, 71 (3rd Cir.) ("Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains."), *cert. denied,* 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985). Second, whether or not Dr. Neufeld performed any services at all is a matter for trial, *see* discussion in "B" *infra.* The government alleges in the Indictment that contractual arrangements were made as overt acts of a conspiracy to violate the Anti–Kickback statute. Whether these were genuine representations of the work to be performed is another matter entirely. In summary, the Court does not find the statute unconstitutionally vague on its face or applied to Dr. Neufeld's alleged conduct.

## B. Safe Harbors

The scope of the Anti–Kickback statute has been a consistent concern of Congress. *See, e.g.,* 42 U.S.C. § 1395nn(b)(3)(B) (1980) (providing an exception for payments pursuant to a bona fide employment relationship). In 1987, Congress reiterated its concerns about the statute's broad spectrum, conceding that "the breadth of [the] language [in the statute] has created uncertainty among health care providers as to which commercial arrangements are legitimate and which are proscribed." S.Rep. No. 109, 100th Cong., 1st Sess. 27, *reprinted in* 1987 U.S.C.C.A.N. 682, 707–08. In this vein, Congress directed the Secretary of Health and Human Services

("HHS") to promulgate "safe harbor regulations" specifying payment practices that would not be subject to either criminal or civil penalties.

■ The safe harbor regulations were issued by HHS in 1991. *See* 42 C.F.R. § 1001.952(a)–(m) (1992). HHS explained that "[i]f a person participates in an arrangement that fully complies with a given [safe harbor] provision, he or she will be assured of not being prosecuted criminally or civilly for the arrangement that is the subject of that provision." *Background to Safe Harbor Provisions,* 56 Fed.Reg. 35952, 35958 (July 29, 1991). The safe harbor provision allowing for payments pursuant to personal services and management contracts provides as follows:

The following payment practices shall not be treated as a criminal offense under section 1128B of the Act ...

(d) *Personal services and management contracts.* As used in section 1128(B) of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following six standards are met—

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic, or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program.

(6) The services performed under the agreements do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

42 C.F.R. § 1001.952(d) (1992).

Dr. Neufeld asserts that because his contractual arrangements with Caremark fell within the above safe harbor provision, the doctrine of entrapment by estoppel precludes his prosecution. In essence, Dr. Neufeld contends that his contract with Caremark fulfilled every element of provision 42 C.F.R. § 1001.952(d) and because HHS "assured" physicians such as himself that compliance with the safe harbor would preclude any sort of prosecution, *see Background to Safe Harbor Provisions,* 56 Fed.Reg. 35952, 35958 (July 29, 1991), this current indictment is nothing more than entrapment by estoppel. The government contends, on the other hand, that although Dr. Neufeld's contract may have followed the letter of the safe harbor provision, his conduct did not comport with paragraph (d)(5) because his compensation constituted referral fees in violation of 42 U.S.C. § 1320a–7b(b).

■ The doctrine of entrapment by estoppel forbids prosecution of conduct which has been sanctioned by the government. In other words, once the government has assured an individual that his conduct will not be subject to sanction, the government may not then initiate a prosecution for engaging in that same conduct. *See Raley v. Ohio,* 360 U.S. 423, 439, 79 S.Ct. 1257, 1267, 3 L.Ed.2d 1344 (1959) (holding that to sustain a conviction under such circumstances "would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."); *see also United States v. Laub,* 385 U.S. 475, 487, 87

S.Ct. 574, 581, 17 L.Ed.2d 526 (1967); *Cox v. Louisiana,* 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965).

■ In the Sixth Circuit, entrapment by estoppel forbids prosecution of the defendant if (1) the government had announced that the charged conduct was legal; (2) the defendant relied on the government announcement; (3) the defendant's reliance was reasonable; and (4) given the defendant's reliance, the prosecution would be unfair. *United States v. Levin,* 973 F.2d 463, 468 (6th Cir.1992).

■ While the entrapment by estoppel defense is usually a matter to be presented to the jury, *see United States v. Pennsylvania Indus. Chemical Corp.,* 411 U.S. 655, 673, 93 S.Ct. 1804, 1816, 36 L.Ed.2d 567 (1973), the defense may be raised in a Fed.R.Crim.P. 12(b)(2) motion to dismiss. *Levin,* 973 F.2d at 467. If the Rule 12 motion involves factual issues, the Court may resolve them independently "if they are capable of determination without trial of the general issues." *Id.* In this instance, Dr. Neufeld calls upon this Court to determine whether he has complied with paragraph five (5) of the safe harbor provision for personal services contracts; specifically, whether the compensation "is consistent with fair market value in armslength transactions and is not determined in a manner that takes into account the volume or value of any referrals." 42 C.F.R. § 1001.952(d)(5).

The Court is skeptical of Dr. Neufeld's suggestion that such a preliminary factual determination would involve "but a few witnesses and the introduction of documentary evidence" (Def. Reply Mem. at 6). Factual hearings of this nature would undoubtedly eclipse the ultimate issue in this case, to wit, whether or not renumeration, kickbacks or bribes were solicited in return for the referral of patients to a Medicare provider. In the Court's opinion, a determination of this issue without trial is unrealistic and would invade the province of the jury. Preliminary factual hearings on a Rule 12 motion, while appropriate under certain circumstances, are not well-suited here.

## C.

Dr. Neufeld's final contention is that counts twenty-eight through thirty should be dismissed because in three specific respects they fail to allege that Dr. Neufeld violated the mail fraud statute. First, Dr. Neufeld submits that because the government relies on an intangible rights theory, the counts must be dismissed because there was no fiduciary relationship between Dr. Neufeld and any of the ostensible victims. Second, Dr. Neufeld contends that the mail fraud statute has not been violated because he did not personally profit from the purported victims. Finally, Dr. Neufeld contends that counts twenty-eight through thirty must be dismissed because they fail to allege any deceptive conduct on the part of Dr. Neufeld. The Court will address each argument in turn.

### 1. Intangible Rights

■ The mail and wire fraud statutes prohibit "any scheme or artifice to defraud" through use of the United States mails or interstate wires. 18 U.S.C. §§ 1341, 1343. "[T]he term 'scheme or artifice to defraud' includes a scheme to deprive another of the intangible right to honest services." 18 U.S.C. § 1346. Section 1346 restored the mail and wire fraud statutes to their interpretation prior to *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which limited the scope of the mail fraud statute to the protection of money or property rights. *Id.* at 356, 107 S.Ct. at 2879–80.

The intangible rights theory of mail and wire fraud is only cognizable, however, when there exists a fiduciary relationship between the victim and the accused. *United States v. Herron,* 825 F.2d 50, 54 (5th Cir.1987) ("Strictly speaking, 'intangible rights fraud' require[s] a fiduciary relationship between the "schemer" and the party or entity defrauded; without a fiduciary obligation, there [is] no fraud in depriving another of an intangible benefit."); *see also McNally,* 483 U.S. at 363–64, 107 S.Ct. at 2883–84 (J. Stevens, dissenting) (acknowledging a need for "clear fiduciary duties"); *United States v. Alexander,* 741 F.2d 962, 964 (7th Cir.1984).

While there appears to be no basis for a fiduciary relationship between Dr. Neufeld and the United States Department of Health and Human Services ("HHS") or between Dr. Neufeld and the Ohio Department of Human Services, Office of Medicaid ("ODHS"), *United States v. Kensington Hosp.*, 760 F.Supp. 1120, 1132 (E.D.Pa.1991), there certainly are elements of a fiduciary relationship between Dr. Neufeld and his patients. *See, e.g., Calvert v. Sharp*, 748 F.2d 861, 863 (4th Cir.1984) ("[A] physician owes his ethical obligation and undivided loyalty to his patient."), *cert. denied*, 471 U.S. 1132, 105 S.Ct. 2667, 86 L.Ed.2d 283 (1985); *United States v. Willis*, 737 F.Supp. 269, 271 (S.D.N.Y.1990) ("It is difficult to imagine a relationship that requires a higher degree of trust and confidence than the traditional relationship of physician and patient."); *Tracy v. Merrell Dow Pharmaceuticals, Inc.*, 58 Ohio St.3d 147, 569 N.E.2d 875, 878 (1991) (recognizing the fiduciary relationship between doctor and patient).

Contrary to Dr. Neufeld's contention, fiduciary duty encompasses more than mere disclosure. If Dr. Neufeld solicited bribes or renumeration in return for referring his patients to Caremark, as it is alleged, then the health of his patients was certainly not his only concern. His patients deserved medical opinions and referrals unsullied by mixed motives. *See* Current Opinions on Ethical and Medical Affairs of the American Medical Association 31–33 (1985) (mandating that referrals be made in the best interests of the patient). This alleged breach of the fiduciary relationship between Dr. Neufeld and his patients supports a theory of fraudulent deprivation of the "intangible right to honest services" under 18 U.S.C. §§ 1341, 1346.

Having found, however, that no similar fiduciary relationship exists between Dr. Neufeld and either HHS or ODHS, the Court holds that the motion to dismiss the indictment is well taken as to counts 28, 29 and 30 in so much as they allege mail fraud only with respect to HHS and ODHS. Reference to "the United States Department of Health and Human Services" and "Ohio Department of Human Services, Office of Medicaid" in paragraph 28 shall be stricken.

### 2. Personal Gain

Dr. Neufeld next asserts that the mail fraud statute has not been violated because Dr. Neufeld did not personally gain from the ostensible victims. Indeed, the government's theory of the case relies on an alleged fraud Dr. Neufeld perpetrated on his patients and the significant sums he received as kickbacks from Caremark. It is not alleged that money or property passed between Dr. Neufeld and either HHS, ODHS or his patients.

An intangible rights theory of mail fraud by its very nature implicates a deception which has as its object something other than money or property. The legislative history to 18 U.S.C. § 1346 (reviving intangible rights mail fraud after *McNally*) is clear in that pecuniary losses are irrelevant to the intangible rights theory.

> [C]ases involving bribery, money laundering, election fraud and licensing fraud have been dismissed because there was no monetary loss to any victim ... This amendment restores the mail fraud provision to where that provision was before the McNally decision ... Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property.

134 Cong.Rec. H11251 (daily ed. Oct. 21, 1988) (statement of Cong. Conyer). Intangible rights mail fraud prior to the *McNally* decision did not require that the victim suffer any pecuniary loss. *See, e.g., United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982) ("In the private sector, it is now a commonplace that a breach of fiduciary duty in violation of the mail fraud statute may be based on artifices which do not deprive any person of money or other forms of tangible property."), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Castor*, 558 F.2d 379, 383–84 (7th Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978).

The holding in *United States v. Walters*, 997 F.2d 1219 (7th Cir.1993), cited by Dr.

Neufeld in support of his contention, does not compel a different result. The Seventh Circuit in *Walters* held that "only a scheme to obtain money or other property from the victim by fraud violates § 1341." *Id.* at 1227. *Walters* involved a fraudulent scheme whereby N.C.A.A. universities continued to pay scholarships to student athletes even though these athletes had signed with the defendant, a budding sports agent. *Id.* at 1221. No money or property passed between the universities and the defendant. *Id.* To the contrary, the defendant intended to recoup his money and more via his percentage on these athletes' professional contracts in the future. *Id.* at 1222.

*Walters* is not dispositive on this issue because it is not an intangible rights theory decision. *Walters* could not have been. The defendant's alleged conduct had transpired after the Supreme Court's decision in *McNally* but before the enactment of 18 U.S.C. § 1346 (reviving intangible rights mail fraud). *See Walters*, 997 F.2d at 1227. The court in *Walters* concentrated on the defendant's purported scheme to obtain future pecuniary sums through his fraudulent acts and did not concern itself with the application of an intangible rights theory. *Id.* at 1226 n. 3.

Furthermore, while no money or property passed hands pursuant to the alleged scheme to defraud in *Walters*, the indictment alleges that substantial sums were transferred by Caremark to Dr. Neufeld. There is ample support in the caselaw for mail fraud prosecutions where the defendant receives financial gain from someone other than the victim. *See, e.g., United States v. Solomonson*, 908 F.2d 358, 364 (8th Cir.1990); *United States v. Little*, 889 F.2d 1367, 1368 (5th Cir.1989), *cert. denied*, 495 U.S. 933, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990).

 The Court finds, therefore, that in the context of an intangible rights theory the defendant need not personally gain from the ostensible victim in order to state a violation of the mail fraud statute.

**3. Evidence of Deception.**

 Finally, Dr. Neufeld contends that the mail fraud counts must be dismissed because they fail to allege any deceptive conduct on the part of Dr. Neufeld. Allegations of deceptive conduct are necessary to state violations of the mail fraud statute. *See McEvoy Travel Bureau v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990) ("[T]he scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct") (emphasis in original), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990).

 The scope of fraud under the mail and wire fraud statutes is broader than under common law and requires no misrepresentation of material fact. *See Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 991 (8th Cir.1989). While the characterization of a scheme to solicit referral fees as mail fraud may be novel, it does not fall outside the boundaries of the mail fraud statute. The court in *United States v. Jain*, No. 94–00087–01, 1995 WL 9301 (W.D.Mo. Jan. 9, 1995), was confronted with a similar contention: "that common sense precludes a finding of fraud on patients, in the absence of any proof that any patient was hospitalized inappropriately." *Id.* at \* 3. Simply put, however, these alleged referral fees were essentially bribes and "[b]eginning in 1988 [with the passage of 18 U.S.C. § 1346] it seems fair to refer to bribery as a per se violation of the mail fraud statute." *Id.* (citations omitted). The indictment in this case alleges bribery and kickbacks solicited by Dr. Neufeld in the face of a known fiduciary duty to his patients. These actions are sufficient allegations of deceptive conduct by Dr. Neufeld to withstand his motion to dismiss.

**III. RULING**

Having found that no fiduciary relationship exists between Dr. Neufeld and either HHS or ODHS, the Court **Grants** the motion to dismiss counts twenty-eight, twenty-nine, and thirty of the Indictment in so much as they allege mail fraud with respect to HHS and ODHS. Reference to "the United States Department of Health and Human Services" and "Ohio Department of Human Services, Office of Medicaid" in paragraph 28 shall be **Stricken.** In all other respects, defendant

Dr. Neufeld's motion to dismiss the indictment is **Denied.**

**IT IS SO ORDERED.**